(Reap. Dec. 10823)

HILL BROWN CORP *v.* UNITED STATES

Entry No. 1352, etc.

(Decided September 14, 1964)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Daniel I. Auster,* trial attorney), for the defendant.

Rao, Judge: The 19 appeals for reappraisement here involved and enumerated on the attached schedule have been consolidated for purposes of trial. They are addressed to the appraisement of various importations of printed linen drapery and slipcover fabrics, exported from England during the period from September 3, 1953, to February 19, 1955.

As these cases have been presented for decision, it is established that appraisement was made upon the basis of cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930, and, insofar as the *computation* of cost of production is concerned, counsel for the plantiff does not challenge the appraiser's finding of a value of £0/9/10.3875 per yard, net, packed. Neither does he contest the presumption inherent in the appraiser's return, predicated upon cost of production, that there was no foreign value or export value, as those

values are defined in section 402 (c) and (d) of the Tariff Act of 1930, or as amended, for such or similar merchandise. Plaintiff confines its case to the contention that United States value, as defined in section 402(e) of the Tariff Act of 1930, as amended, is the proper basis for determining the value of the involved merchandise and that such values were $1.172 net for the 1953 exporations and $0.975 net for the balance of the merchandise.

Excluded from consideration in this case is all merchandise invoiced at 60 cents per yard in reappraisement appeals R59/16109, R59/16110, and R59/19348, and at 55 cents per yard in reappraisement appeals R59/16120 and R59/16121, as to which merchandise said appeals have been abandoned.

The section under which it is claimed that the instant merchandise should have been appraised, to wit, section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, provides as follows:

UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

The record herein consists of the testimony of one Peter Kaufmann, who, during the years from 1952 through 1955, was an officer, director, and general manager of the plaintiff corporation, together with certain exhibits numbered 1 through 10, hereinafter described. In substance, they tend to establish the following facts:

Plaintiff is a corporation engaged in three separate business operations. Primarily, it is a manufacturer of domestic drapery and slipcover fabrics which are produced in Clifton, N.J. It is also an importer of two distinct lines of products, to wit, "man-made fibers for resale to the textile industry in the United States," and "decorative linens for distribution throughout the United States for drapery and slipcover purposes." It is the last-mentioned phase of plaintiff's business with which we are here principally concerned.

The linen fabrics in issue, as illustrated by four samples marked plaintiff's illustrative exhibits 1–4, are described as having been "made exclusively of flax, woven in various countries on the European continent, printed in an England printing plant in Barrowford, Lancashire, and shipped in patterns and designs typical of English dec-

orative fabrics which had a wide market in this country." Except for the design, they are stated to be commercially interchangeable. These fabrics are purchased by plaintiff for its own account with exclusive American rights for the designs selected.

It appears that, during the weaving operations, linen fabrics are produced in lengths of 50 or 100 yards, but before printing, to permit a continuous process, the pieces are stitched together to form lengths as long as 1,000 yards. As imported, the merchandise was described as being flat-folded, pressed in bales, in individual piece lengths of several hundred yards, so handled to permit economies in shipment and to assure proper attractive packaging for the American market. After importation, the material was washed, cut into individual pieces approximately 50 yards long, doubled, and rolled on cardboard cores. It was sold in piece units of 40 to 50 yards or more, at prices which did not vary by reason of the quantity purchased. These prices were $1.62 per yard, less 2 per centum 10 days, net 30, f.o.b. Clifton warehouse on all sales to department stores, retailers, and manufacturers, and $1.52 per yard, less 2 per centum 10 days, net 30, f.o.b. Clifton, for all sales to jobbers and wholesalers, for the period through November 30, 1953. Thereafter the prices dropped to $1.35 or $1.25, respectively, less 2 per centum 10 days, net 30. Jobbers were allowed the 10 cents a yard discount to enable them to sell to small retailers. Plaintiff made no sales to consumers other than those designated as manufacturers. Otherwise there were no restrictions on the resale, disposition, or use of its merchandise by the purchasers.

Plaintiff's exhibits 5 and 6 are so-called pricelists which the record shows were not distributed to plaintiff's customers, but were used by plaintiff's salesmen who were required to conform to its schedules.

The record further reveals that the merchandise was shipped from the printing mill in Barrowford, Lancashire, England, via Liverpool and New York, to Philadelphia, Pa., the port of entry, and was ultimately delivered in Clifton, N.J. With the use of the customs brokers figures for individual charges for the respective entries, as well as the invoices and other official papers, plaintiff's witness compiled a schedule, received in evidence as plaintiff's exhibit 7, showing the freight, insurance, and clearance charges, applicable to the various entries. Separately specified, in amounts which, for reasons hereinafter assigned, need not be expressly stated, are clearance charges at Philadelphia, inland freight from Philadelphia to Clifton, and c.i.f. charges from Barrowford to Philadelphia, via New York.

There were also received in evidence as plaintiff's exhibits 8 and 9, respectively, fiscal balance sheets, with attached profit- and loss-statements, for the periods ending March 31, 1954, and March 31, 1955,

which were prepared by the plaintiff's certified public accountants, the firm of Herbert Strauss & Co.

With the aid of said balance sheets, and in collaboration with the accountant, the witness arranged for the preparation of a breakdown of general expenses and profits stated to reflect those items for the linen fabric operations of the company. This was received in evidence as plaintiff's exhibit 10. It is apparent from the explanation of the figures appearing on exhibit 10, as well as from the testimony of the witness, that no separate records of expenses and profits of this particular phase of plaintiff's business were kept by the company and that the overhead expenses and profit for the linen fabric operations were calculated from the ratio of linen sales to the total sales of all of the company's products.

Mr. Kaufmann stated on cross-examination that included in overhead expenses were "office salaries, office salaries of employees, rent, telephone and telegraph, cable expenses, traveling and entertainment expenses, furniture and fixtures, and sampling expenses." He explained, with respect to exhibit 10, that the figures for general expenses of $79,328.08 or 17.56 percent were arrived at as follows:

If you will check the figures on the right-hand side which states $312,437.50, this comprises our total overhead for the fiscal period ending March 31, 1954. And since our linen sales comprise 25.07 percent of our sales we have prorated the overhead accordingly and arrived at this figure of $78,328.08.

In support of the contention that United States value as, defined, *supra*, is the proper statutory basis for the determination of the value of the merchandise at bar, plaintiff alleges that it has affirmatively established that the unwashed, uncut, printed linen fabric, as imported, is similar to the cut, washed, attractively packaged fabric freely sold or offered for sale f.o.b. Clifton, N.J., to all purchasers other than jobbers, at a price of $1.62 per yard, less 2 per centum cash discount, for the period ending November 30, 1953, and at $1.35 per yard, less 2 per centum cash discount, through February 1955, without any restrictions as to the disposition and use thereof; and that the deductions therefrom to find United States value within the statutory definition are as shown in the record.

Counsel for the Government controverts several of the premises upon which plaintiff relies for its claimed basis of value, contending that the merchandise, in its condition as imported, is neither such as, nor similar to, the merchandise offered for sale to domestic purchasers; that the United States prices to domestic buyers have not been established since the pricelists were private pricelists not distributed to the customers of plaintiff; and that the deductions from the American price, especially for general expenses and profit have not been properly proven.

If in any of the respects alleged by the defendant the proof of the plaintiff is found wanting, then the appraised value must be allowed to stand, for the law has clothed the appraiser's action with the presumption of correctness and casts upon the party challenging that action the burden of proving some other proper value. 28 U.S.C., section 2633. In so doing, it is incumbent upon the plaintiff to meet every material issue in the case and to establish every element entering into the claimed basis of value. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593.

Although much of the argument of adversary counsel is concerned with the issue of whether the merchandise as sold for domestic consumption in the United States is such as, or similar to, the merchandise in its condition as imported, the question does not seem to be a particularly perplexing one. The article imported and the subject of appraisement here was printed linen fabric of a type to be used in the making of slipcovers and draperies. The article sold to domestic purchasers was printed linen fabric of a type suitable for use in the making of slipcovers and draperies. What differentiates the two articles is the change in condition resulting from washing, cutting into 50-yard pieces, double rolling on cardboard cores, and attractive packaging. But in the conversion from the condition of the fabric as imported to its condition as sold in the United States, no change in the essential character of the material is effected. Such processing as the fabric must undergo to enhance its domestic marketability results in a change of appearance and not of substance and is not so marked as to render the fabric in its two states dissimilar for purposes of appraisement.

While commercial interchangeability has been considered an acceptable criterion for determining similarity between two classes of merchandise (*United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19 T.D. 42714; *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T.D. 42837), it is not an indispensable test which must be met in every instance. Products have been found to be similar for purposes of valuation if they are composed of substantially the same materials, are produced in substantially the same manner, and are adapted to substantially the same uses. *Scharf Bros. Co. (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 347, T.D. 43089; *United States* v. *Thomas & Co. et al.*, 21 CCPA 254, T.D. 46788; *H. J. Heinz Company* v. *United States*, 43 CCPA 128, C.A.D. 619.

In the instant case it is obvious that the merchandise is the same material in both its imported and marketed condition and that the finishing processes to which it is subjected in this country do not alter

its ultimate essential uses. For that reason, the court is inclined to the view that the merchandise sold by the plaintiff for domestic consumption in the United States was similar to the merchandise in its imported condition.

Granting the similarity of the imported merchandise with the processed fabric sold in the American market, was the latter freely offered for sale to all purchasers for domestic consumption in the usual wholesale quantities and in the ordinary course of trade within the contemplation of the statutory provision for United States value, *supra?* It is noted that the witness, in explanation of his company's sales policies, stated unequivocally that no sales were ever made to consumers. "We would not sell to consumers. We were a legitimate company selling to department stores, regular retail outlets and manufacturers."

The language "freely offered for sale * * * to all purchasers" has been construed as embracing all who cared to buy such goods in the usual wholesale quantities and in the ordinary course of trade, and the "law is not concerned with the persons who buy, but the manner in which they buy." *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T.D. 42216; *United States* v. *American Glantzstoff Corp.*, 24 CCPA 35, T.D. 48308; *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773. If the testimony of the witness for the plaintiff is susceptible of being construed as eliminating sales to consumers whether or not they desired to purchase usual wholesale quantities, and it seems clear that it is, then to that extent, it must follow that linen fabric of the type here involved was not freely offered for sale to all who cared to buy it.

But plaintiff's failure to sustain its burden of proof need not be confined to this ground alone, for even assuming a free offering to all purchasers in the ordinary course of trade and that consumers would not care to purchase such or similar goods in the usual wholesale quantities, the record is deficient in respect to allowable deductions from the domestic price.

That a domestic price has in fact been established, notwithstanding the use of private pricelists which are clearly without evidentiary value,[1] is fairly inferable from the testimony of the witness who had personally sold this merchandise under a uniform sales policy of the company which dictated prices of $1.62 per yard, less 2 per centum through November 30, 1953, and $1.35 per yard, less 2 per centum through the remainder of the period involved. But it is the domestic price, less stated statutory deductions "for duty, cost of transportation

---

[1] *North American Asbestos Corp.* v. *United States,* 43 Cust. Ct. 500, Reap. Dec. 9518, affirmed *United States* v. *North American Asbestos Corp.,* 44 Cust. Ct. 801, A.R.D. 123; *United States* v. *Philipp Brothers Chemicals, Inc.,* 46 Cust. Ct. 803, A.R.D. 134; *Judson Sheldon International Corporation* v. *United States,* 51 Cust. Ct. 374, Reap. Dec. 10586.

and insurance, and other necessary expenses from the place of shipment to the place of delivery * * * profits not to exceed 8 per centum and a reasonable allowance for general expenses not to exceed 8 per centum on purchased goods," which must be found.

The term "general expenses" as used in the provision in question has been held to refer to overhead and other operating expenses incidental to the production and sale of the particular goods under consideration. *Judson Sheldon International Corporation* v. *United States, supra.*

The record herein establishes that plaintiff was engaged in three different kinds of business activities. Its principal operation was the manufacture and, presumptively, sale of domestic cotton drapery and slipcover fabrics. It also imported manmade fibers for sale to the textile trade in addition to importing and selling linen fabrics of the type involved in the instant case. While plaintiff's exhibit 10 sets forth the total costs and net sales receipts of its linen fabric division, it appears, as explained by the witness, that the amount of overhead expenses and the consequent percentage of overhead were derived by finding the ratio between total sales of all kinds and total linen sales, and applying that percentage to total overhead expenses.

Does it necessarily follow that the share of operating expenses attributable to linen fabric transactions bears the same proportion to the total general expenses as the volume of linen fabric sales bears to the total sales of all three phases of the company's operations? As pointed out in the *Judson Sheldon* case, *supra*, "This is unsatisfactory proof, since it may well be that it cost more to handle other types of merchandise, or less, as the case may be, than the outlay incurred for handling the imported merchandise." The record is barren of any evidence to show that in the processing and marketing of the merchandise at bar, operating costs were proportionately the same as the operating costs for conducting the other phases of plaintiff's business, however that proportion might be determined.

Since plaintiff's exhibit 10 shows net profit and profit percentage to be calculated by deducting general expenses ascertained as hereinabove indicated, it is equally clear that the item of profit upon which plaintiff relies is also an estimate not based upon specific costs and expenses attributable to the purchase and sale of linen fabrics such as are here involved.

While counsel for defendant also disputes the figures submitted by plaintiff with respect to freight, insurance, and customs clearance, it appears that plaintiff's exhibit 7, upon which those items were listed, was received in evidence without objection from the defendant; and although it is evident that the witness had no personal knowledge of the figures which were used in the computations, no objection to the

exhibit on the grounds of hearsay was interposed. Under such circumstances the evidence is admissible and may be taken into consideration in resolving the issues raised in an action. *W. T. Grant Company* v. *United States*, 38 CCPA 57, C.A.D. 440. However, since other essential elements of proof have been found to be insufficient, the question of the evidentiary value of plaintiff's exhibit 7 is moot.

In view of the foregoing considerations, this court makes the following findings of fact:

1. The merchandise covered by these appeals for reappraisement consists of printed linen fabric, exported from England to the United States during the period from September 3, 1953, through February 19, 1955, and imported through the port of Philadelphia, for ultimate delivery in Clifton, N.J.

2. At the time of exportation such or similar merchandise was not freely offered for sale in the principal markets of the country of exportation either for domestic consumption or for exportation to the United States.

3. The merchandise was appraised upon the basis of cost of production, as that value is defined in section 402 (f) of the Tariff Act of 1930, at £0/9/10.3875.

4. It is claimed that said merchandise is dutiable upon the basis of United States value, as defined in section 402 (e) of the Tariff Act of 1930, as amended.

5. As imported, the merchandise was in compressed bales containing flat-folded lengths of fabric made up of 50 yard average lengths sewn together for convenience in printing.

6. The imported package was designed to afford economies in shipping and to enable the importer to prepare a package acceptable to the American purchaser.

7. After importation the fabric was cut into average 50-yard lengths, double-rolled on cardboard cores, and attractively packaged.

8. The principal market in the United States for the sale of such or similar imported linen was Clifton, N.J., and the price did not vary with the quantity sold.

9. Both the imported fabric and the processed fabric were intended for use in the making of draperies and slipcovers.

10. The processing of the fabric in the United States did not change its essential character or its adaptability for use. It merely changed the form in which it was marketed.

11. The said processed and repackaged linen fabric was sold to all department stores, retailers, and manufacturers at the price of $1.62 per yard, less 2 per centum, packed, for the period between September 1, 1953, and November 30, 1953, and at the price of $1.35 per yard, less

2 per centum, packed, for the period between December 1, 1953 and June 1, 1955, without restrictions as to resale, disposition, or use.

12. Sales to jobbers and/or wholesalers were at prices 10 cents per yard less than the prices enumerated in finding of fact numbered 11.

13. No sales were made to consumers other than manufacturers.

14. At or about the dates of exportation of the involved merchandise, plaintiff was engaged in three phases of business operations. It manufactured and sold cotton drapery and slipcover fabrics, which was its principal activity. It imported manmade fibers for sale to the textile industry. It imported linen fabric such as here involved.

15. In calculating the item of general expenses, the importer applied the percentage its linen fabric sales bore to total sales to the total general expenses, from which a percentage of general expenses for the linen fabric division was derived.

16. The item of profit was calculated after general expenses, as ascertained in accordance with the procedure outlined in finding of fact numbered 15, were deducted.

17. The cost of freight, insurance, clearance charges, and duty were set forth in the record without objection of counsel.

18. Appeals for reappraisement of all merchandise invoiced at 60 cents per yard and included in R59/16109, R59/16110, and R59/19348, and all merchandise invoiced at 55 cents per yard in R59/16120 and R59/16121, were abandoned.

Based upon the foregoing findings of fact, the court makes the following conclusions of law:

1. At or about the dates of exportation of the merchandise, covered by the instant consolidated appeals for reappraisement, there was no "foreign value" or "export value" for such or similar merchandise, as those terms are defined in section 402 (c) and (d) of the Tariff Act of 1930, or as amended.

2. The merchandise in its condition as imported and the merchandise in its condition as sold to domestic purchasers was similar merchandise.

3. The record does not establish that at or about the dates of exportation of the merchandise here involved such or similar imported merchandise was freely offered for sale for domestic consumption in the United States to all purchasers in the usual wholesale quantities and in the ordinary course of trade.

4. The evidence of record is insufficient to show general expenses and profit.

5. There is no satisfactory evidence to overcome the presumptively correct values found by the appraiser.

Judgment will be entered accordingly.