(A.R.D. 155)

SAMUEL SHAPIRO & COMPANY, INC., a/c THE SHARPE & HART ASSOCIATES, INC. *v.* UNITED STATES

Entry No. 1100.

First Division, Appellate Term

(Decided April 30, 1963)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the appellant. *John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the appellee.

Before OLIVER, WILSON, and FORD, Judges

OLIVER, Chief Judge: In this proceeding, we review the decision of Richardson, J., reported as *Samuel Shapiro & Company, Inc., a/c The Sharpe & Hart Associates, Inc.* v. *United States*, 48 Cust. Ct. 641, Reap. Dec. 10242, which held statutory United States value, as found by the appraiser, to be the proper basis for appraisement of certain

rifle parts, identified on the invoice as "100 actions cal. 222 Rem. M. 54," that were exported from Otterup, Denmark, on July 21, 1956, and entered at the port of Baltimore, Md., on August 6, 1956. The so-called "actions" under consideration are the firing mechanisms for a rifle.

In a written stipulation submitted before the trial court, counsel for the respective parties agreed as follows:

At the time of exportation of said actions to the United States there was no "foreign value" and no "export value" as defined in Section 402(c) and Section 402(d) Tariff Act of 1930, as amended.

At the said time of exportation other actions similar to the said actions No. 54 were not offered for sale for domestic consumption in the United States.

At the said time of exportation said actions were freely offered for sale at $90.00 each in Mattoon, Illinois, by the Ted Holmes Gun Shop to all purchasers for domestic consumption, said actions having previously been purchased from Sharpe & Hart, Emmitsburg (where they had been originally delivered from Denmark) and shipped from Emmitsburg to Mattoon.

The appraised value of $67.057 each, net packed, was based upon a "United States value" for "purchased merchandise" as defined in Section 402(e) Tariff Act of 1930, computed as follows:

| | |
|---|---|
| Sales price per piece in Mattoon | $90.00 |
| Less 2% discount for cash | 1.80 |
| | $88.20 |
| No profit to seller in Mattoon | 0.00 |
| | $88.20 |
| Less general expenses to seller in Mattoon, which exceeded 8% | 7.056 |
| | $81.144 |
| Less cost of transportation and insurance from Denmark to Mattoon | 2.155 |
| | $78.989 |
| Less U.S. duty | 11.932 |
| | |
| Appraised value per piece, net packed | $67.057 |

In computing said "United States value" the appraiser made no deduction for the following items:

(a) Clearance charges at Baltimore, Md. at___ $0.28 each
(b) General expenses of Sharpe & Hart Inc. at Emmitsburg (overheads, selling expenses, etc.) at_____ $0.32 "

$0.60 "

The "cost of production" as defined in Section 402(f) Tariff Act of 1930, for said actions was $37.00 each, net packed.

In addition to the foregoing agreed set of facts, there was introduced by plaintiff the oral testimony of the president and general manager of The Sharpe & Hart Associates, Inc., of Emmitsburg, Md.,

an importer of sporting and target firearms and parts. The witness testified that, at the time of exportation of the present merchandise, his firm was the sole importer and exclusive distributor for the United States of No. 54 actions, such as the articles involved herein, and that all sales thereof were made to the Ted Holmes Gun Shop of Mattoon, Ill., which had to buy the imported No. 54 actions from The Sharpe & Hart Associates, Inc., at Emmitsburg. The customs agents' reports (defendant's exhibits A and B) offer no contradiction of the importer's oral testimony.

The primary issue herein is the determination of the "principal market" as the term appears in the statutory definition of United States value, section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, which is as follows:

The United States value of imported merchandise shall be *the price at which such* or similar *imported merchandise is freely offered for sale for domestic consumption*, packed ready for delivery, *in the principal market of the United States to all purchasers*, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods. [Italics supplied.]

At the hearing before the trial judge, counsel for appellant (plaintiff below) stated the issue as follows (R. 2-3):

* * * Specifically, the Government has ruled and has based their appraisement upon the fact that Mattoon, Illinois, is the principal market in the United States.

On the other hand, we claim that the principal market is in Emmitsburg, Maryland. A stipulation of fact has been prepared which I believe covers all pertinent facts with the exception of where the principal market is.

It is on that one point that we are in disagreement and it is on that one point that this whole valuation question revolves.

The stipulation of fact indicates that if Emmitsburg is the principal market, then the United States market is restricted and there can be no United States values and you then would use a cost of production.

To support appellant's position herein, counsel, in his brief, argues that there are two markets in the United States for the present merchandise, "a restricted primary market in Emmitsburg, and (2) an unrestricted secondary market in Mattoon," and that since "reference can be made to prices only in one principal U.S. market for United States value purposes, it is our contention that the 'principal' market must be the primary market."

The designations, "primary market" and "secondary market" are terms employed by appellant to advance the novel theory upon which

it relies in this case. Nowhere, in any of the cases mentioned in appellant's brief, is there any reference to, or any distinction made, between a "primary market" and a "secondary market."

The statutory term is "principal market," and it contemplates a market where sales are made in accordance with conditions expressly stated in the law. The case of *Innis, Speiden & Co. et al.* v. *United States*, 19 CCPA 1, T.D. 44789, has controlling effect. Although the case arose under the Tariff Act of 1922, and involved appraisement of an imported commodity on the basis of American selling price, the statutory language of section 402(f) of the Tariff Act of 1922, as it defined American selling price, is the same, so far as the present discussion is concerned, as section 402(e), as modified, *supra*, defining United States value. Each of the said bases for appraisement requires that the value of imported merchandise thereunder shall be the price at which it is freely offered for sale "in the principal market of the United States," in the usual wholesale quantities and in the ordinary course of trade.

In the *Innis, Speiden* case, it was shown that there were two American distributors—Henry Sundheimer and Baugh Chemical Co.—of the chemical product involved therein; that Sundheimer sold approximately 80 per centum of the output of the commodity; that all of his sales were subject to conditions that resulted in a controlled price and uncertainty as to a definite American selling price; and that the Baugh Chemical Co., which sold only 20 per centum of the entire American output, made its sales in accordance with the requirements of the statute. In determining the principal market for appraisement purposes, the appellate court stated as follows:

The Baugh Chemical Co., according to the record, is located in Baltimore. Its sales, as shown in the record, are made to various purchasers, chiefly on the Atlantic seaboard-eastern Pennsylvania and New York. Sundheimer also sells from a plant in Baltimore and sells to consumers on the eastern seaboard. The query has been suggested, Is the principal market for this kind of merchandise where the goods are delivered, or where the goods are made and can be obtained? *The principal market is certainly not shown by proof of sales not made in accordance with the provision of the statute.* Sundheimer's testimony as to the principal market is, obviously, based upon his own sales, which sales do not conform to the statutory requirements. [Italics supplied.]

Our attention has been called to no other testimony in the record as to the principal market except that of Sundheimer, and we know of no other. The record also shows that from 20 to 40 per centum of the American-produced commodity is freely offered for sale in the usual wholesale quantities and in the usual course of trade, from a Baltimore plant to various consumers in Pennsylvania and in states other than the states referred to as the principal market by Sundheimer. It seems to us that the principal market where the sales were made in accordance with the provision of the statute, under this record, is at Baltimore.

In the present case, sales of the merchandise under consideration at Emmitsburg, Md., were concededly restricted to an exclusive United States dealer. Such sales, therefore, did not conform to statutory requirements. *United States* v. *Heemsoth-Kerner Corp. et al.*, 31 CCPA 75, C.A.D. 252. On the other hand, sales by the Ted Holmes Gun Shop at Mattoon, Ill., that bought all of this merchandise from the importer located at Emmitsburg, met all of the mandatory conditions of the statute. Hence, under the pronouncements of the *Innis, Speiden* case, we hold, as did the trial court, that the principal market for the present merchandise is, on the basis of the record herein, Mattoon, Ill.

Appellant's contention that the "location of the principal market in the United States is not predicated upon free offers for sale" is untenable. United States value, as defined in section 402(e), as amended, embodies several requirements, each of which has equal importance as a factor in determining such statutory value. In other words, the price that truly represents United States value is the price that includes all of the essential elements of the statutory definition. Stated differently, the United States value of an imported commodity is the price at which such or similar merchandise is freely offered for sale in the principal market of the United States to all purchasers for domestic consumption. It follows therefrom that since sales at Emmitsburg, Md., of the so-called actions in question, were specifically limited to one purchaser, and the merchandise was not freely offered for sale to all purchasers, the importer's price at Emmitsburg could not be a valid one for the purposes of appraisement.

Cases cited in appellant's brief to support its contention, suggesting a distinction between a "primary market" and a "secondary market" in finding "the principal market" for appraisement of the present merchandise, cannot be applied herein. *United States* v. *Mutual Supply Co. et al.*, 11 Cust. Ct. 461, Reap. Dec. 5950; *American Import Co.* v. *United States*, 7 Cust. Ct. 556, Reap. Dec. 5470, affirmed in *United States* v. *American Import Co.*, 8 Cust. Ct. 737, Reap. Dec. 5642; and *United States* v. *S. S. Kresge Co. et al.*, 26 CCPA 349, C.A.D. 39. Following is a brief statement relating to each of the cited cases.

In determining the principal market for the canned clams involved in the *Mutual Supply Co.* case, the court followed the well-established principle that "the *principal market* is where sales are made to the various purchasers, that is, where merchandise is sold as distinguished from a place where merchandise is delivered for sale." [Italics quoted.]

The *American Import Co.* case, *supra*, turned on the application of the statutory term, "principal markets," as it appears in the definition of export value in the Tariff Act of 1930, section 402(d). Recognizing the use of the plural, "markets," therein, the court held Kobe, Japan,

and Mojii, Japan, to be principal markets for the bamboo rakes involved in the said case. The *Kresge* case, *supra*, related to certain Christmas tree decorations. The issue therein was whether the manufacturers' prices met all of the statutory requirements of foreign and export values, as such values are defined in section 402 (c) and (d) of the Tariff Act of 1930. There is nothing about either of those cases to affect the outcome of the present case.

Having determined that Mattoon, Ill., is the principal market for the so-called actions involved herein, consideration is now directed to appellant's alternative claim for allowance of certain items, hereinabove set forth, not deducted by the appraiser in his computation of statutory United States value.

With respect to the charge for "General expenses of Sharpe & Hart Inc. at Emmitsburg (overheads, selling expenses, etc.)" in the amount of 32 cents each, we agree with the trial court, in its conclusion, stating that—

\* \* \* no distinction is made under the statute between general expenses incurred by the importer and those incurred by the purchaser of the imported merchandise. In either case, all that the appraiser may deduct from the selling price is 8 per centum of the general expenses. That is precisely what the appraiser did in the appraisement of the involved merchandise, and I find no error in the appraisement on this account.

In connection with the item of "Clearance charges at Baltimore, Md.," it is important to note that the statutory definition of United States value, section 402(e), as amended, *supra*, allows, as deductible items, the "necessary expenses from the place of shipment to the place of delivery," and, as stated in the *Mutual Supply Co.* case, *supra*, " 'delivery' of course is from the principal market." Since the clearance charges under consideration were incurred in the process of shipping the merchandise to the principal market, i.e., "the place of delivery," they are properly deductible in finding statutory United States value for the present merchandise; and, as the parties have agreed that the appraiser made no allowance for such charges, the amount thereof, concededly 28 cents each, is a proper deduction from the value found by the appraiser, and we so hold.

For all of the reasons hereinabove set forth, and on the basis of the present record, we find as matter of fact:

1. That the merchandise involved herein consists of certain rifle parts, identified on the invoice as "100 actions cal. 222 Rem. M. 54," exported from Otterup, Denmark, on July 21, 1956, and entered at the port of Baltimore, Md., on August 6, 1956.

2. That the present merchandise was appraised on the basis of the United States value of such merchandise.

3. That, at the time of exportation of the merchandise in question, such or similar merchandise was not freely offered for sale to all

purchasers in the principal markets of the country from which exported, in the usual wholesale quantities, and in the ordinary course of trade, either for home consumption in Denmark or for exportation to the United States.

4. That merchandise, such as that involved herein, was freely offered for sale for domestic consumption, in the usual wholesale quantities and in the ordinary course of trade, in the principal market of Mattoon, Ill., at the time of exportation of the present merchandise.

5. That clearance charges, incurred at the port of entry in the process of bringing the merchandise to the principal market, was a necessary expense from the place of shipment to the place of delivery.

Accordingly, we conclude as matter of law:

1. That there is no foreign or export value for merchandise, such as or similar to the actions involved herein.

2. That the proper basis for appraisement of the present merchandise is United States value.

3. That the United States value for the actions in question is the appraised value, less clearance charges of 28 cents each, or $66.777 each.

The judgment of the trial court is modified. Judgment will be rendered accordingly.